*EXHIBIT A-1*

Page 1

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

                            -   -   -
3

VALERIE BAINBRIDGE,          : CIVIL ACTION
4                                 :

         vs.                      :
5                                 :

ACME MARKETS, INC.           : NO. 09-4683
6

7

                            -   -   -
8                     April 20, 2010
                            -   -   -
9

10                    Oral deposition of VALERIE
BAINBRIDGE, taken pursuant to Notice, was held at
11 Buchanan, Ingersoll & Rooney, Two Liberty Place,
50 South 16th Street, 32nd Floor, Philadelphia,
12 Pennsylvania, commencing at 10:15 a.m., on the
above date, before DIANNE NAULTY, a
13 Federally-Approved, Registered Professional
Reporter and Notary Public in and for the
14 Commonwealth of Pennsylvania.

15

16                          -   -   -
17

18

19

20      VERITEXT NATIONAL COURT REPORTING COMPANY
                 MID-ATLANTIC DIVISION
21        1801 Market Street - Suite 1800
          Philadelphia, Pennsylvania  19103

22

23

24

25

1                    Valerie Bainbridge

2   with us so he did graduate, and then he's just

3   stayed with us because our basement is finished

4   off and he lives down there.

5          Q.        He must have been in high school,

6   is that correct, when he first came to live with

7   you?

8          A.        Yes.

9          Q.        What high school did you go to?

10         A.        Owen James Roberts.

11         Q.        Did you claim him as a dependent at

12  any time on your income tax returns?

13         A.        Yeah.

14         Q.        When you were employed by Acme,

15  were you a member of a union?

16         A.        Yes.

17         Q.        What union was that?

18         A.        United Food and Commercial Workers

19  Union.

20         Q.        Do you know which local?

21         A.        When I left, it was 27.  At one

22  time it was 1357, I believe.

23         Q.        Is that the same union, it just

24  changed names?

25         A.        Yes.

1              Valerie Bainbridge

2        Q.        Other than UFCW Local 27, and

3    whatever it was called prior to the local change,

4    had you been a member of any other union?

5        A.        No.

6        Q.        I understand you have been employed

7    by Acme for a long time.  I'm going to, in the

8    interest of making sure we get to everything we

9    need to get to today, I'm going to start with your

10   employment at West Chester.  Okay?

11       A.        Okay.

12       Q.        If at any time today you're

13   confused by the timeframe of my questions, I'll

14   try to be clear, but if you ever are confused by

15   that, let me know so we can clarify that.

16       A.        Okay.

17       Q.        How was it that you became employed

18   at the West Chester store?

19       A.        The store was just being built.  It

20   was a new store.  They were putting bids up for

21   full-time positions.  I put in for the service

22   counter, and I got that position, so I was working

23   part time, and I thought it was, you know, good to

24   go to full time, and I did get the job.

25       Q.        What job did you get?

Page 21

1                      Valerie Bainbridge

2         A.        Service counter.

3         Q.        What was your title in that job?

4         A.        It wasn't really a title.  It was

5    just a service counterperson.  There was no title.

6    It wasn't like a head cashier or, you know, frozen

7    food or anything.

8         Q.        Was that the position you held when

9    you first went to the West Chester store?

10        A.        Yes.

11        Q.        Did you have to bid for that

12   position?

13        A.        Yes.

14        Q.        Who was the store director at the

15   time you first went to West Chester?

16        A.        Ron Bresinger.

17        Q.        Can you place in time when you went

18   to West Chester?

19        A.         I went, I believe it was, August,

20   and they opened in September, because I needed

21   training on the photo lab.

22        Q.        Is this the year 2004?

23        A.        I believe so.

24        Q.        What other positions did you hold

25   at West Chester?

1                    Valerie Bainbridge

2        A.        West Chester, yeah.

3        Q.        When did you become the office

4   coordinator?

5        A.        Officially, I think it was December

6   17th of '07.

7        Q.        I'm going to show you some

8   documents today.  Some of them my questions will

9   be very general.  Other documents we might spend

10  more time on.  But if at any time I start talking

11  and you have not finished reading the document or

12  you need more time to read it, just let me know.

13  It's hard to judge how fast people read, et

14  cetera.

15       A.        Okay.

16            MS. MALLOY:  Let's mark this as

17        the first exhibit.

18                     - - -

19            (Job Request Form was marked as

20        Defendant's 1 for identification by the

21        court reporter.)

22                     - - -

23  BY MS. MALLOY:

24       Q.        Defendant's Exhibit 1 is a Job

25  Request Form.  Is that your signature?

Page 24

1                    Valerie Bainbridge

2         A.        Yes.

3         Q.        Is this the Job Request Form you

4    completed to bid for the office coordinator

5    position in West Chester?

6         A.        Yes.

7         Q.        Under the middle section that says,

8    briefly describe your qualifications for the job,

9    you say you had 20 years night office.

10                   Could you describe that in more

11   detail for me?

12        A.        It was basically balancing the

13   checkers' tills, doing the deposits, balancing the

14   safe.  Sometimes I would also be, at the same

15   time, the front end, which would mean send people

16   on their breaks, lunches, tell them what time to

17   go home.  That kind of thing.

18        Q.        At what store or stores did you

19   have 20 years of night office experience?

20        A.        That was at West Goshen.

21        Q.        Two years full time courtesy booth

22   and OC backup.  What does that refer to?

23        A.        That would be at the West Chester

24   store.  I was full time for two years there.  I

25   worked at the courtesy booth and I was also the

1                    Valerie Bainbridge

2     coordinator backup.

3          Q.        How many days a week did you

4     perform the office coordinator job as the backup?

5          A.        Mary didn't work Sundays, and

6     Wednesday was her day off, so it was normally two

7     days.

8          Q.        Did you cover for her during any

9     vacations or holidays?

10         A.        Yes.

11         Q.        Did you have a good relationship

12    with Mary?

13         A.        Yes.

14         Q.        How is it that you learned to be

15    the office coordinator backup?

16         A.        When we first went to West Chester,

17    they had one system, and she taught me that, and

18    it wasn't long after that that they switched to

19    Peoplesoft, and it was different, so she had to

20    show me how to do that.

21         Q.        How did you learn how to be the

22    backup?

23         A.        She just taught me as she was doing

24    things.  That's how I learned, by her showing me

25    what she was doing.

1            Valerie Bainbridge

2            MS. MALLOY:  Let's mark this as

3      the next exhibit.

4                    - - -

5            (Store Work Rules was marked as

6      Defendant's 2 for identification by the

7      court reporter.)

8                    - - -

9   BY MS. MALLOY:

10       Q.      Defendant's Exhibit 2 is titled

11  Store Work Rules.  Take as long as you need.  My

12  question will be have you ever seen this before.

13       A.      Yes, I have seen this before.

14       Q.      Did you receive a copy of the Store

15  Work Rules while you were employed at Acme?

16       A.      Yes.

17       Q.      Did you have a copy to take home?

18       A.      Yes.

19            MS. SCHNEIDER:  I just want to

20      object.  Do you mean a copy to take home

21      while she was employed with Acme or in

22      connection with the litigation?

23            MS. MALLOY:  While she was

24      employed.

25            Do you understand my question?

Page 27

1              Valerie Bainbridge

2              THE WITNESS:  Yes.

3              MS. MALLOY:  Let's mark this as

4         the next exhibit.

5                   - - -

6              (Company Retail Policies was

7         marked as Defendant's 3 for identification

8         by the court reporter.)

9                   - - -

10   BY MS. MALLOY:

11        Q.      Exhibit 3 is entitled Company

12   Retail Policies.  The last few pages say

13   Albertsons slash Acme Retail Policies Addendum.

14             My question is, did you receive a

15   copy of this document while you were employed by

16   Acme?

17        A.      I would say yes.

18        Q.      It looks familiar to you?

19        A.      Yeah.

20        Q.      And how about the last couple of

21   pages in the different font, do they look familiar

22   to you?

23        A.      I don't know that I specifically

24   saw this.

25        Q.      You're referring to the last three

Page 30

1                    Valerie Bainbridge

2          A.        Well, I know that's how they want

3    people to be treated.

4          Q.        How did you learn that?

5          A.        It's just something everybody has

6    always known while they worked at Acme.  They want

7    people to be treated right.

8          Q.        Did you ever hear anyone refer to

9    the courtesy, dignity and respect policy?

10         A.        No.

11         Q.        Did you ever hear anyone refer to a

12   1-800 hotline number?

13         A.        Yes, I did hear that.

14         Q.        And tell me what you remember about

15   the 1-800 number.

16         A.        I don't remember exactly how I knew

17   about it.  Maybe another employee told me.

18   Probably another employee told me that they had a

19   hotline.

20         Q.        What was your understanding about

21   the hotline?

22         A.        I guess if you saw someone doing

23   something wrong, that I should call them and that

24   you wouldn't be penalized for it.

25         Q.        Anything else that you remember

1          Valerie Bainbridge

2    being told about the hotline?

3          A.      No.

4                  MS. MALLOY:  Let's mark this as

5          the next exhibit.

6                        - - -

7                  (Notice of Equal Employment

8          Opportunity Policy was marked as

9          Defendant's 5 for identification by the

10         court reporter.)

11                       - - -

12   BY MS. MALLOY:

13         Q.      Defendant's Exhibit 5 is called

14   Notice Equal Employment Opportunity Policy.  Was

15   there a bulletin board in the employee lounge at

16   the West Chester store?

17         A.      Yes, there was.

18         Q.      Have you seen the document which is

19   Exhibit 5?

20         A.      Yes.

21         Q.      Was that posted on the bulletin

22   board?

23         A.      Yes.

24                 In regard to my problem --

25                 MS. SCHNEIDER:  I'm sorry.  Is

```
 1                    Valerie Bainbridge
 2    employed, that there was an ethics and compliance
 3    policy?
 4         A.     No.
 5         Q.     Take a look at this document, six.
 6    Is anything in it familiar to you, while you were
 7    employed?
 8         A.     And your question was?
 9         Q.     Does any of it look familiar to
10    you?  I know your testimony was that you don't
11    remember seeing the booklet.
12         A.     Well, the booklet, I guess,
13    basically says that you're supposed to follow
14    Acme's policy, which, I guess, everybody knows
15    that.  But I don't really recall seeing the
16    booklet itself.
17         Q.     Okay.  I understand that.
18              MS. MALLOY:  Let's mark this as
19         the next exhibit.
20                    -  -  -
21              (Store Work Rules and Dress and
22         Appearance Guidelines was marked as
23         Defendant's 7 for identification by the
24         court reporter.)
25                    -  -  -
```

1             Valerie Bainbridge

2   else is or some description for me?

3              MS. SCHNEIDER:  I'm sorry.  Did we

4         establish what documents she had?

5              MS. MALLOY:  I don't want you to

6         coach the witness.

7              We can do it either way.  I asked

8         you what you got rid of.

9              THE WITNESS:  I probably had this

10         dress and appearance guideline.  I didn't

11         keep too many things.

12   BY MS. MALLOY:

13         Q.     How did you decide what to keep and

14   what to get rid of?

15         A.     I guess I kept things that were

16   kind of personal, things about my job that I

17   liked, and I guess the rest I felt I didn't need

18   anymore.

19         Q.     What documents did you have then?

20   What documents did you have when you left Acme?

21         A.     Really, just probably the union

22   handbook and maybe the dress code, and, like I

23   said, those Trumpeter magazines.  I didn't really

24   have too many documents.

25         Q.     Did you take a lot of documents

1               Valerie Bainbridge

2    home regarding other employees?

3         A.      I did take things home near the end

4    when I was having problems.  I took things home to

5    prove that I was doing things right and that other

6    people were doing things and nothing happened to

7    them for it.

8         Q.      When did you start taking those

9    type of documents home?

10        A.      I believe it started after

11   September the 6th when they asked me to step down.

12        Q.      Of the types of documents that you

13   started taking home after September 6th, did you

14   discard any of those?

15        A.      I don't believe I did, no.

16        Q.      We'll talk about them later.

17             MS. MALLOY:  Let's mark this as

18        the next exhibit.

19                    - - -

20             (Time Clock Policy was marked as

21        Defendant's 8 for identification by the

22        court reporter.)

23                    - - -

24   BY MS. MALLOY:

25        Q.      Defendant's 8 is called Time Clock

1                    Valerie Bainbridge
2    Policy.  Is that your signature?
3         A.      Yes.
4         Q.      And did you receive a copy of this
5    policy to take home?
6         A.      Yes.
7         Q.      The documents that you took home
8    during the course of your employment with Acme,
9    where did you keep them?
10        A.      In a desk in the basement.
11        Q.      Have you given everything that's
12   left to your lawyers?
13        A.      Yes.  Like I said, I had pretty
14   much gotten rid of everything when I left.
15        Q.      And why did you get rid of
16   everything when you left?
17        A.      I didn't think I needed them
18   anymore because I wasn't working there.
19        Q.      At the time that you were employed,
20   though, did you contact the EEOC to possibly
21   pursue some kind of discrimination claim?
22        A.      Yes.
23        Q.      When you got rid of them, what did
24   you do with these documents?
25        A.      I guess I just threw them out.

1           Valerie Bainbridge

2                MS. MALLOY:  Let's mark this as

3        the next exhibit.

4                        - - -

5                (Time Clock Policy was marked as

6        Defendant's 9 for identification by the

7        court reporter.)

8                        - - -

9                THE WITNESS:  By documents I guess

10       you're referring to these type of things,

11       right?

12               MS. MALLOY:  I'm referring to

13       whatever you had at home.

14               THE WITNESS:  Well, I didn't throw

15       out the things that I had brought

16       pertaining to the discrimination.  You

17       know, proving other people did things

18       wrong, I kept those things.

19   BY MS. MALLOY:

20       Q.       Is there anything that you already

21   testified to that describes your process of what

22   you kept and what you threw out?

23       A.       I basically threw out, like,

24   handbooks or union, dress code, things like that

25   that I didn't need.

1                  Valerie Bainbridge

2          Q.        Time clock policies?

3          A.        I don't know if I still had that.

4    I don't think I did.

5          Q.        How much stuff did you throw out?

6          A.        I only had a few things.  Like I

7    said, I basically kept the better things.

8          Q.        That was your opinion, that they

9    were the better things.

10         A.        Yeah.

11         Q.        When you say the Trumpeter said you

12   had 25 years, or that a friend of yours did, or a

13   new store opening that you were at, things like

14   that.

15         A.        Yes.

16         Q.        Exhibit 8 is dated 3/9/95 and the

17   other one is dated November 6, '96.

18         A.        That's my signature.

19         Q.        That's your signature on Exhibit 9?

20         A.        Correct.

21         Q.        And is this a document that you

22   took home at some point during your employment?

23         A.        I would say yes.

24         Q.        And did you feel like you had an

25   understanding of the time clock policy?

1              Valerie Bainbridge

2        A.        Yes.

3        Q.        Did you attend any training during

4   which the time clock policy was explained?

5        A.        I don't remember any training.  I

6   do remember we got a new type of time clock and

7   they showed us how to use it.

8        Q.        Can you put that in a timeframe?

9        A.        I don't know when that was.  I may

10  have still been at West Goshen.  I probably was at

11  West Goshen.

12       Q.        Did you ever see a video or a

13  broadcast on the time clock policy?

14       A.        I don't recall seeing that, no.

15       Q.        Have you reviewed the video that we

16  gave to your lawyer?

17       A.        Yes.

18       Q.        Do you remember seeing that before?

19       A.        No.  I watched it and I do not

20  remember seeing it.

21       Q.        Who, if anybody, told you about the

22  time clock policy?  I'm not referring to the

23  documents that you signed.

24       A.        No one really talked to me about

25  it.  I mean, I got these papers and signed them,

1                    Valerie Bainbridge

2         A.        I believe she worked at other

3    stores as a director.

4         Q.        Why do you believe that?

5         A.        She was either a co or a manager.

6    I'm not sure which.  When she first came, I said,

7    Martha, I'm newer at the office coordinator job.

8    She said, that's all right because we'll work

9    together.

10        Q.        She told you that when she came to

11   West Chester?

12        A.        Yes.

13        Q.        This is the one that is 11.  So 11

14   is the Counseling Conference Memo.  It's dated

15   August 2nd, 2007.  Is that your signature?

16        A.        Yes.

17        Q.        What were your duties with respect

18   to time card modification slips?

19        A.        I was taught by Mary Kay, the

20   office coordinator previous to me, that if there

21   was any change in someone's punch, that you had to

22   fill out the time card slip, which I did.  I kept

23   them, just as Mary did, at the service counter

24   desk.  When the checks came in, you would paper

25   clip that to the person's check, and then when

1                Valerie Bainbridge

2    they wanted to pick their check up, they had to

3    sign the form.

4           Q.     Sign the modification slip?

5           A.     Yes.  After they sign these, I

6    would put them in a three-ring binder in the

7    office.  I was never asked at any time by three of

8    my managers to bring those office slips to them,

9    never.  And then all of a sudden Martha gives me

10   this write-up because I wasn't doing it.  This

11   non-authorized overtime --

12         Q.    Let's stop -- I'll give you a

13   chance to describe that in a second.

14         A.     Okay.

15         Q.     Prior to August 2nd of '07, did you

16   give the time card modification slips to a manager

17   to approve?

18         A.     No.  I was never told to.  They

19   were there.  If they wanted to, all they had to do

20   was ask me, explain it to me, Val, I would like to

21   have these.  It was never done.

22         Q.     Under what circumstances did a time

23   card modification slip have to be completed?

24         A.     It was supposed to, the way I

25   understood it from Mary Kay, was just to be done

1                Valerie Bainbridge
2    if there was a change.  Say someone didn't punch
3    in in the morning and then you would call them and
4    say, what time did you come in, and they would say
5    seven o'clock, and then you would put that in and
6    you would have to write the form out.  Then Kim
7    Walsh said to me, I want a time card modification
8    slip made out for everything, if a person is late,
9    if they leave early, everything.  I mean, I was
10   writing a stack of these every day.
11         Q.      When did Kim Walsh come to West
12   Chester?
13         A.      Kim was there when Mike Jones was
14   there.  I don't know exactly what timeframe, but
15   she was there when Mike was there.
16         Q.      Did she come after you?
17         A.      I believe she was probably there
18   when the store opened.  I think she might have
19   been the first co.
20         Q.      So prior to this August 2nd of '07
21   warning, you did not give the time card
22   modification slips to a manager to approve.  Is
23   that correct?
24         A.      Right.
25         Q.      You kept them in a binder in your

Page 52

1               Valerie Bainbridge

2        Q.        At the time of this August 2nd, '07

3    warning, did you have any idea one way or the

4    other what the company's policy was on whether

5    time card modification slips had to be signed by

6    management?

7        A.        I just knew that I was to make them

8    out, and Mary Kay did not tell me that I was to

9    give them to a manager, and I did what she did.  I

10   kept them at the desk for the employees to sign

11   and then I put them in a three-ring binder.

12       Q.        Do you believe it was age

13   discrimination for Ms. Thourley to tell you to

14   give her the slips to be signed?

15       A.        No.   That was her right to ask me

16   for those, and I probably should have been doing

17   it, but I was never told to.   What I feel is age

18   discrimination is I feel this is just all a paper

19   trail to try to get rid of me.

20       Q.        And I'll give you as much time

21   today as you need to explain that to me, but let's

22   try to do it chronologically.

23               Up until this point, August 2nd of

24   '07, is there anything other than this warning,

25   which is Exhibit 11, that you believe was age

1              Valerie Bainbridge

2         A.       I would say they were because

3    Martha had asked me in August.  So I would say

4    they were.

5         Q.       And then prior to Exhibit 11, the

6    August 2nd warning, prior to the warning, your

7    practice was to not have the time card

8    modification slip signed by the manager.  Is that

9    correct?

10        A.       Right.  But I don't know if she

11   ever signed them because I would give them to her,

12   but I don't know what happened to them after that.

13        Q.       Okay.  I'm back on 11 now.  The

14   second incident says, no unauthorized overtime

15   unless management approves.

16              Can you tell me what that was

17   about?

18        A.       That was on Monday the 30th.  The

19   system crashed, and I had absolutely no figures to

20   balance the store.  I called the help desk.  I

21   kept getting the answering machine saying the box

22   is full.  Finally, later in the day, I got a hold

23   of them and left a message.  In the meantime, I

24   was going through all of the records that I could

25   and manually filling in what I could, and I had

1                    Valerie Bainbridge

2     just about most of it done.  I was done two

3     o'clock that day.  Around 10 of 2:00 the help desk

4     called and I told them what my problem was and

5     they walked me through the rest of the things that

6     I needed to complete that day.  I punched out

7     around 2:30, so that made me a half hour late.

8     Martha, when she found this out, wrote this and

9     said to me, I should have called the help desk and

10    told them to call back tomorrow.

11          Q.      Okay.

12          A.        I felt that I shouldn't -- I guess

13    I felt that I didn't need to call her and say,

14    Martha, I need to get these figures to finish for

15    the day, can I talk to the help desk.  I just felt

16    that I needed to do this, and I did it, and on

17    11/5 --

18          Q.      What year are you talking about?

19          A.       '07.  I was on a personal holiday

20    and the same thing happened to Betty Tackett, who

21    was my backup.  At that time, Martha told her,

22    take all the time you need and I will even get

23    Dave Rzucidlo from Granite Run to come help you.

24    So I was written up for a half hour and Betty was

25    allowed six hours of overtime for the same thing.

Page 61

1                    Valerie Bainbridge
2            MS. MALLOY:  I don't think she
3       answered.
4            THE WITNESS:  I feel she didn't
5       want me in the office because I was too
6       old.  She felt I couldn't do computers.
7       When she asked me to step down, I said I
8       did what she said.  I did right.  I have
9       proof that I did it right.  Kim told me
10      that Martha wanted me to step down and that
11      if I didn't do it, they were going to write
12      me up until they got me fired.
13           MS. MALLOY:  And we'll talk about
14      that.  I told you we'll try to do it
15      chronologically.
16  BY MS. MALLOY:
17      Q.      Why did you believe Martha didn't
18  want you in the office, because you were too old?
19      A.      I think she felt I wasn't computer
20  literate, that she felt that the young kids have
21  it in school all day long and they pick it up
22  quick.  She did like Katlin.  She very much liked
23  Katlin and Katlin was very good on doing all kinds
24  of fancy stuff on that computer.  It's the only
25  thing I can really figure.

1                    Valerie Bainbridge

2          Q.        You testified to one comment that

3    Martha made to you about computers.

4          A.        Yes.

5          Q.        Could you put that in a timeframe

6    for me?

7          A.        That was when they had the

8    interviews for -- there were supposed to be three

9    girls.  Only two showed up.  It was the interview

10   for my job.  I was in Martha's office, and she

11   said, I guess to make me feel good, that I could

12   maybe learn how to do the schedule and I could do

13   the schedule for her.  At that time, she said that

14   younger people are brought up on the computers and

15   older people have a harder time, and she said,

16   even I do.

17         Q.        Referring to herself?

18         A.        Yes.

19         Q.        Now, if Martha were to replace you

20   in your office coordinator position, that position

21   would have to be bid through the union procedures.

22   Correct?

23         A.        Right.  I think they were training

24   Michelle Moore at Granite Run for a year.  I think

25   maybe they were planning on putting her in there.

Page 64

1              Valerie Bainbridge

2          marked as Defendant's 13 for identification

3          by the court reporter.)

4                    - - -

5     BY MS. MALLOY:

6          Q.        Exhibit 13 is a Counseling

7     Conference Memo and the date is August 21st, 2007.

8                    Is that your signature?

9          A.        Yes.

10         Q.        Were you presented with this

11    document?

12         A.        Yes, I was.

13         Q.        And who was there?

14         A.        It was Martha, Kim Carol, the union

15    rep, myself.

16         Q.        On Exhibit 11, which is the August

17    2nd, 07 counseling conference, were you presented

18    that in person as well?

19         A.        Yes.

20         Q.        Who was at that meeting?

21         A.        The union rep and Martha and I.

22         Q.        Do you remember which union rep?

23         A.        Kim Carol.

24         Q.        How did you get along with the

25    union reps?

1                  Valerie Bainbridge

2         A.       Kim was very friendly, very nice.

3    I didn't really associate a lot with people.  I

4    came to work and did my job and went home.  I

5    wasn't in any clicks.  But, I mean, she was very

6    friendly and very nice.

7         Q.       How about Carol Waite, she was the

8    other union rep?

9         A.       I didn't really have any

10   relationship with her until this started.

11        Q.       So we're looking at Exhibit 13.

12   Can you tell me, to the best of your recollection,

13   what happened at the meeting in which you received

14   this memo?

15        A.       Well, Martha said that I didn't do

16   payroll right.  She said that I wasn't paying

17   department heads correctly when they filled in for

18   people on vacation.  I knew how to do this, and I

19   did it -- there's various department heads that

20   will tell you that they were paid correctly.  The

21   only time people didn't get paid right, in my

22   opinion, is when Kim Walsh would make up the

23   schedule.  When you make up the schedule, you put

24   in there, deli manager, say, and if you did not

25   put in deli manager in there, that person would

1               Valerie Bainbridge

2        A.       Well, she said some associates

3    weren't paid.  Like before, no one came to me and

4    said they didn't get paid.  So at this time they

5    mention this time-off request form.  When I was

6    trained by Mary Kay, she just showed me, you look

7    at the schedule and it says Jane wants a vacation,

8    Tom wants a PH.  I would go down the line and

9    write everybody down what they needed and post

10   that next to the computer so when the day came for

11   me to put in vacations and personals, I would have

12   it.  Then Kim said to me, you should go by the

13   request-off form, and I told her I didn't know

14   anything about a request-off form, and she,

15   Martha, made arrangements for Dave Rzucidlo from

16   Granite Run to come help me with this.  So he

17   showed me how to pull this form up.  So after

18   that, I would do it.  And they didn't always

19   match.  The request-off form might say, Jane wants

20   a vacation, and over on the schedule she wouldn't

21   be scheduled for a vacation, or she would be

22   scheduled for a personal holiday when she wanted a

23   vacation.  They never -- so no matter which I

24   followed, it was going to be wrong.  You know, it

25   was like, if I followed this form, I might be

```
 1                   Valerie Bainbridge
 2        Q.        Did you talk to Kim about personal
 3   things?
 4        A.        Yeah, I think so.
 5                  MS. MALLOY:  Let's go off the
 6             record.
 7                          - - -
 8                  (Whereupon, the deposition
 9              recessed.)
10                          - - -
11                  MS. MALLOY:  We have stipulated
12             between counsel that we will consider
13             conversations between witnesses and counsel
14             to be attorney/client privilege which take
15             place at breaks during the deposition.
16   BY MS. MALLOY:
17        Q.        Did you file any grievance with
18   respect to Defendant's Exhibit 13?
19        A.        No, I didn't file a grievance, but
20   Kim Carol, the union rep, did tell Martha that she
21   didn't think that these were fair.
22        Q.        What are you referring to when you
23   say "these"?
24        A.        These write-ups.  She gave me three
25   on the same day.
```

Page 74

1                    Valerie Bainbridge

2          Q.      Right now we're looking at Exhibit

3     13.

4          A.      Yes.

5          Q.      With respect to 13 --

6          A.      Yeah, she felt that the write-ups

7     weren't fair.

8          Q.      Were there three write-ups on

9     August 21st?

10         A.      No.  They were on 11/3 or four.

11         Q.      Did you file any grievance with

12    respect to Defendant's Exhibit 11?

13         A.      No.  I have never really dealt with

14    the union.  I never had a problem, so I guess I

15    didn't really realize that I was supposed to go

16    and grieve things.  You know, I just figured, time

17    would go on and that it would pass.

18         Q.      Did Kim Carol make any comments to

19    you with respect to 13?

20         A.      No, I don't think so.  Not

21    especially.  I think it was more the next set.

22         Q.      Okay.  I'll give you an opportunity

23    to talk about that.

24         A.      In thinking about it, where it says

25    about people being paid personals and vacation

1                    Valerie Bainbridge

2    days.

3           Q.       You're looking at 13?

4           A.       Yes.

5           Q.       Okay.

6           A.       There were two instances, Ryan

7    McQuiston (ph), who was the grocery manager, he

8    was on the schedule on a Saturday to work 8:00 to

9    4:30 and he didn't punch in that day, so there was

10   nothing about vacation, so I assumed he was out

11   sick.  So he had complained because he didn't get

12   paid for it, but that wasn't my fault.

13          Q.       So he was supposed to --

14          A.       He wanted a vacation day that

15   day --

16          Q.       But you put him in sick?

17          A.       Yes.  So he didn't get paid.  The

18   schedule said 8:00 to 4:30, no punches.  So

19   there's 50-some people in the store so I don't

20   know who worked the day before, so I just thought

21   he was out sick.

22          Q.       Okay.

23          A.       Steve Jones, he was the other one.

24   It was the same thing.  He was scheduled to work

25   on Saturday and he didn't -- I have all the

1           Valerie Bainbridge
2    presented with Defendant's Exhibit 13?
3           A.      Say that again.
4           Q.      When Martha and the union talked to
5    you about Exhibit 13 with respect to the payroll
6    issues, were there any specific people whose names
7    were brought up, even if you don't remember the
8    names now?
9           A.      No.  Never.  I had no idea who she
10   was talking about.
11          Q.      If you could look at Defendant's
12   12, which is the audit form.  Correct?
13          A.      Right.
14          Q.      Did you know Tim Collier before he
15   came for this audit?
16          A.      No.  I never met him.
17          Q.      And what, if any, conversations did
18   you have with Mr. Collier regarding the audit?
19          A.      Of course I asked him how I did.
20   He said I did well.  Then he said to me, why are
21   you stepping down.  I said, because Martha, you
22   know -- he asked was it my idea to step down, and
23   I said, no, it was Martha's.  And he said she told
24   him it was payroll related, and he said, well, why
25   don't you just give her a little more training

1              Valerie Bainbridge

2    because she balances your store every week.  He

3    said everything in here is at his fingertips.  The

4    office is immaculate.  At that time, I even told

5    him that I thought, you know, it was a matter of

6    just Martha not wanting me in there and I was even

7    thinking of getting a lawyer at that time.

8          Q.      You told that to Tim Collier?

9          A.      Yes.  I asked him if they produced

10   any kind of a document saying that I passed the

11   audit, and he said, yes, and I said, would he send

12   me a copy, and he said, yes, he would e-mail me a

13   copy.  He also said that they should transfer me

14   to the Phoenixville store because the girl there

15   doesn't know what she's doing.  So I felt that if

16   the auditor thought I was good, why am I being

17   asked to step down.

18         Q.      Did you tell Mr. Collier that you

19   were stepping down?

20         A.      I told him that Martha asked me to

21   step down.  Well, he knew that because she must

22   have told him that.  He knew that when he came in

23   the room because he asked me whose idea it was.

24         Q.      And the first page of Defendant's

25   12 at the stop it says, ask Tim his opinion of

1           Valerie Bainbridge

2      Q.      '06 or '07?

3      A.      Did you say '07?

4      Q.      I said '07.

5      A.      Yes.

6      Q.      '07?

7      A.      Yes.

8      Q.      Do you remember the date of this

9  meeting?

10      A.      September 6th.

11      Q.      Of 2007.   Correct?

12      A.      Yes.

13      Q.      And who was there?

14      A.      At that time the union rep.  Carol

15  Waite came into the office and asked me to come

16  into the back, and she didn't know what for, and

17  when we got back there, it was Martha Thourley and

18  then Marianne Donaghue.

19      Q.      Tell me everything that was said at

20  this meeting.

21      A.      Pretty much Martha just wanted me

22  to step down because of payroll issues.  I was

23  very upset.  I was just totally caught off guard.

24  When she said that I have paid Shelly Doonan

25  wrong, and of course, if you're taken to a meeting

1           Valerie Bainbridge

2    with no prior warning, I had no remembrance of

3    what I had paid her in June.  So I went out into

4    the hall with the union rep.

5           Q.    Let's stop there for a second.  Is

6    there anything else that you remember being said

7    at this meeting, either by you or anybody else up

8    to this point?

9           A.    I don't really remember anything.

10          Q.    Okay.

11          A.    So Carol Waite took me out in the

12   hall and she said that I should probably step down

13   because if I didn't, they would just keep

14   harassing me until I did.  So being very upset, I

15   went in and said, you know, that I would step

16   down.  The next morning I came in --

17          Q.    Hold on a second.  Before we get to

18   the next morning, was there anything else that

19   happened at this meeting after you went back in?

20          A.    Well, I know I was very upset.  I

21   was crying.  I asked for another chance.  Marianne

22   Donaghue said she would give me a month trial and

23   Martha looked me in the eye and she said, no, I

24   want you to step down.

25          Q.    Okay.  Anything else?

Page 82

1                    Valerie Bainbridge
2          A.      That's it.
3          Q.      What did step down mean?  Was that
4    described for you?
5          A.      Pardon?
6          Q.      Did they tell you what stepped down
7    meant?
8          A.      I knew it meant to give my job up.
9          Q.      To give the office coordinator job
10   up?
11         A.      Yes.
12         Q.      Were you told that you could stay
13   at the West Chester store?
14         A.      At that time, yes.
15         Q.      Were you told that you would have
16   full-time hours?
17         A.      Yes.
18         Q.      Were you told what it was that you
19   were going to do after you stepped down?
20         A.      I guess I was just going -- I was
21   entitled to be the first checker, 7:00 to 3:30.
22         Q.      By virtue of your seniority?
23         A.      Uh-huh.
24         Q.      Is that a yes?
25         A.      Yes.

1          Valerie Bainbridge

2          Q.       Okay.  And was there any discussion

3     at this meeting on September 6th about what duties

4     you would perform until a replacement was found?

5          A.       Right.  I was to stay there until

6     they bid and someone was given the job.

7          Q.       So you were going to stay as the

8     office coordinator until a replacement was

9     selected through the bid process.  Is that

10    correct?

11         A.       Yes.

12         Q.       Did you maintain the salary of the

13    office coordinator?

14         A.       Yes.

15         Q.       Did you continue to perform the

16    office coordinator duties?

17         A.       Yes.

18              MS. SCHNEIDER:  Objection.

19              MS. MALLOY:  What's the objection?

20         Don't coach her.

21              MS. SCHNEIDER:  I'm not coaching.

22         I was going to ask you if you wanted to

23         specify a time period for that question.

24              MS. MALLOY:  No.

25    BY MS. MALLOY:

1                    Valerie Bainbridge

2    conversations with the union about stepping down,

3    either before or after the September 6th meeting?

4         A.        I came back the next morning, found

5    out that I had, in fact, paid Shelly correctly.

6    So I told Carol Waite I didn't want to step down

7    because I had done the payment correctly.

8         Q.        What else did you tell Carol?

9         A.        Just basically that I didn't want

10   to step down.

11        Q.        What did Carol say?

12        A.        I don't think she really had an

13   answer for me, other than the fact that you have

14   to step down.  She didn't, like, do anything about

15   it.

16        Q.        Was that a telephone call with

17   Carol?

18        A.        Yes.

19        Q.        Any other discussions with the

20   union regarding stepping down?

21        A.        No.

22        Q.        Did you talk to anybody at the

23   company about your decision to step down?

24        A.        I had e-mails.  I e-mailed Marianne

25   Donaghue and I e-mailed Marianne Nice and Stacy

1             Valerie Bainbridge

2    Slate.

3             MS. MALLOY:  Let's mark this as

4         the next exhibit.

5                  -  -  -

6             (Letter was marked as Defendant's

7         14 for identification by the court

8         reporter.)

9                  -  -  -

10   BY MS. MALLOY:

11        Q.    Exhibit 14 is a September 12th

12   letter from Stacy Slate to Carol Waite.  While you

13   were employed by Acme, had you ever seen this

14   letter?

15        A.    No, I don't think so.

16        Q.    While you were ever employed by

17   Acme, or elsewhere, did you ever communicate with

18   the union in writing or by e-mail?

19        A.    No.

20        Q.    Did you continue to perform the

21   office coordinator duties at West Chester?

22        A.    After the September 6th meeting?

23        Q.    Yes.

24        A.    Yes, until they suspended me.

25        Q.    You can add if you want.

Valerie Bainbridge

1

2          A.          I did forget at the September 6th

3     meeting I was told not to do the payroll.

4          Q.          Not to do the payroll?

5          A.          Right.  That was going to be given

6     to Katlin Roger.

7                       MS. MALLOY:  Let's mark this as

8               the next exhibit.

9                               - - -

10                      (E-mail string was marked as

11              Defendant's 15 for identification by the

12              court reporter.)

13                              - - -

14     BY MS. MALLOY:

15          Q.          Did you continue to do any payroll

16     after the September 6th meeting?

17          A.          In September I know I didn't, and

18     then Katlin, I guess, couldn't work the hours of

19     the schedule for office coordinator because she

20     was going to college.  So then it was Tuesday,

21     Wednesday and Thursday she would work 2:00 to

22     10:00, and Friday she had off, so then, because

23     she wasn't really available, then I would have to

24     do it.  So, like, Friday at 8:00 a.m. you had to

25     have all of your punches done and everything

1                    Valerie Bainbridge

2    because you had to send the week's figures into

3    Gina, the district manager's secretary.  So with

4    her not working Friday, that left me to do it.

5    But most of the payroll was done by her.  Days

6    that she couldn't, I would do it.

7          Q.        Are you able to define for me what

8    payroll you continued to do?

9          A.        Basically edit the punches and on

10   Friday get the figures.  I think some weeks I

11   would do the vacations and personal holidays and

12   then on Monday I believe she would do the

13   submitting of the payroll.

14         Q.        Would you estimate that was 50

15   percent, 60 percent?  What percentage of work

16   after September of '07 were you doing that was

17   payroll, compared to what you did before?

18         A.        Fifty or less.

19         Q.        Exhibit 15 is a string of e-mails

20   with Marianne Donaghue.  Correct?

21         A.        Right.

22         Q.        When did you print this document

23   out?

24         A.        Probably at the time I was doing

25   it.  It says 9/11.

1                    Valerie Bainbridge

2           Q.        The date at the bottom, would that

3     show the time it was printed out?

4                    MS. SCHNEIDER:  Do you mean the

5           date at the very bottom?

6                    MS. MALLOY:  Yes.

7                    THE WITNESS:  It said 9/11.

8     BY MS. MALLOY:

9           Q.        So that would indicate the date it

10    was printed out?

11          A.        Yes.

12          Q.        Did you take it home after you

13    printed it out or did you keep it in the office?

14          A.        I think I left it in the office for

15    a while and then I took them home.

16          Q.        How did you keep documents like

17    this in the office?

18          A.        There were sliding drawers under

19    the counter and I think it was on the far right.

20          Q.        When did you take all of that stuff

21    home.

22          A.        I guess shortly after I did.

23          Q.        What did you do with it when you

24    took it home?

25          A.        Just kept it in the desk.

Page 90

1                      Valerie Bainbridge
2           Q.      With the other stuff in your desk?
3           A.      Uh-huh.
4           Q.      Is this a yes?
5           A.      Yes.
6           Q.      Why did you want to talk to
7     Marianne?
8           A.      I wanted to explain to her that the
9     pay issue that I was accused of, which apparently
10    was the reason that I was supposed to step down, I
11    hadn't done wrong.  I wanted to show it to her so
12    that hopefully she could save my job for me.
13          Q.      Why do you believe that you had not
14    done anything wrong with respect to the pay issue?
15          A.      Two days that week in June,
16    Thursday and Friday, she was on the schedule four
17    hours each day.
18          Q.      This is Shelly?
19          A.      Yes.  So she worked the four hours,
20    so she got each day, so that's what she got paid.
21    So then the following week she wanted to make up
22    that time with two four-hour vacations.  So when I
23    put in for payroll, I put in the 40 hours that she
24    worked, plus eight-hours vacation, four hours for
25    each day that she worked a half a day.  I guess

1               Valerie Bainbridge

2   Martha, not realizing what took place, felt I paid

3   her for 48 hours.

4         Q.      Was she, in fact, paid for 48

5   hours?

6         A.      She was paid for 48 because eight

7   was to make up for the two days that she wanted

8   for those eight hours.

9         Q.      Okay.

10        A.      She did not -- it was not on the

11  schedule that she was to get four hours and four

12  vacations.  So, of course, she punched for four

13  hours, so that's what she got paid, and then later

14  I guess she decided that she wanted to use

15  vacation time for that.  So, actually, there was a

16  note from Katlin saying that Shelly wanted the

17  vacation time.

18        Q.      And do you know how this issue was

19  brought to Martha's attention?

20        A.      I don't know.

21        Q.      And what should have Shelly been

22  paid?

23              MS. SCHNEIDER:  Objection.  She

24        assumes that she shouldn't --

25              MS. MALLOY:  Just object as to

1                    Valerie Bainbridge

2          form.   That's fine.

3                    MS. SCHNEIDER:  Okay.

4                    MS. MALLOY:  If you don't

5          understand my question, let me know.

6                    THE WITNESS:  Maybe explain it

7          again, but I think I know what you mean.

8    BY MS. MALLOY:

9          Q.       Why do you believe that what you

10   were told with respect to Shelly was incorrect?

11         A.       Because I feel the woman was

12   entitled to the eight hours.  I mean, she had

13   eight hours vacation due her.  She worked two

14   four-hour days, so she was short eight hours, and

15   I guess she needed the money and she decided to

16   use her vacation, so I put in for it.  So I feel I

17   paid her correctly.

18         Q.       How did Martha explain to you what

19   she viewed as the problem with respect to Shelly's

20   pay?

21         A.       She just said that you can't pay

22   somebody 40 hours a week and an eight-hour

23   vacation day.  So I guess she thought that I paid

24   the woman for 48 hours and she only worked 40,

25   which wasn't the case.  I paid her for the week

1              Valerie Bainbridge

2         She just treated me like that.  Whenever

3         she talked to me, it was always just, like,

4         nasty.

5   BY MS. MALLOY:

6         Q.      Other than the one example that you

7   gave, do you remember any --

8         A.      The only --

9         Q.      Let me finish.

10              Do you remember any other

11  incident?

12        A.      No, nothing specific.

13        Q.      How did other employees in the

14  store get along with Kim?

15        A.      I heard Katlin complaining about

16  her.  Katlin would say she didn't like her and

17  that she was nasty.  A lot of people felt that she

18  was, I guess, harsh.  But I don't recall anybody

19  really fighting with her.  There some people

20  that she really liked, you could tell.

21        Q.      Who do you think she really liked?

22        A.      John Amarillo for one.  He was the

23  frozen food manager.

24        Q.      What issues at the time were you

25  having with your grandchildren?

Page 114

1              Valerie Bainbridge

2        Q.      Okay.

3        A.      I went to Kim.  I told her I had

4   paid Shelly correctly.  I didn't realize it was

5   such a shock when they brought this notice in so I

6   stepped down.  I said, so since I stepped down, I

7   didn't feel I should step down.  She said, Martha

8   said to do it this way or we're going to write you

9   up until you got fired.

10       Q.      Okay.

11       A.      That was the conversation.

12       Q.      Did you repeat to anybody else at

13  the company that conversation you recounted to me?

14       A.      Yes.  I probably told Yolonda

15  Perez, probably Ryan Douglas and probably Betty

16  Tackett.

17       Q.      Did you tell Marianne Nice?

18       A.      No, I don't think so.  I just had

19  those couple e-mails.

20       Q.      The only communications about

21  stepping down after the personal meeting were the

22  e-mail conversations with Marianne Nice and

23  Marianne Donaghue.  Correct?

24       A.      Right.

25       Q.      Did you tell anybody at the union