IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VALERIE BAINBRIDGE | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ACME MARKETS, INC. | : | No. 09-4683 |

**MEMORANDUM**

Ludwig, J.                                                                                      March 15, 2012

In this action, plaintiff Valerie Bainbridge sues her former employer, defendant Acme

Markets, Inc., for age discrimination and retaliation under the Age Discrimination in

Employment Act (ADEA), 29 U.S.C. §§ 621-634 and Pennsylvania Human Relations Act

(PHRA), 43 P.S. §§ 951-963.  The lawsuit also claims compensation for unrecorded overtime

work under the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. §§ 201-219.  Acme

moves for summary judgment (doc. no. 35), and Bainbridge moves for partial summary

judgment on the FLSA allegations (doc. no. 36).  Fed. R. Civ. P. 56.  Jurisdiction is federal

question; and supplemental jurisdiction as to the PHRA claims.  28 U.S.C. §§ 1331, 1367(a).

These motions, together with plaintiff's motion for sanctions, will be denied.

1.  History

On September 6, 2008, Bainbridge filed charges of discrimination with the Equal

Employment Opportunity Commission (EEOC) and the Pennsylvania Human Relations

Commission (PHRC).  On October 3, 3008, Acme received the EEOC's notice of the charge.

By notice dated July 14, 2009, the EEOC dismissed the charge because it was unable to

conclude that sufficient information was submitted to establish violations of the pertinent statutes and also informed plaintiff of her right to sue.

On October 13, 2009, plaintiff filed the complaint, and on March 11, 2011, discovery was closed. (Dec. 21, 2010 Order, doc. no. 32.) On April 1, 2011, the parties filed the pending summary judgment motions. On July 7, 2011, Bainbridge moved to sanction Acme for destruction of her personnel file, electronic mail, and documents related to five disciplinary memoranda that Acme had issued in 2007 (doc. nos. 48). By letters dated July 8 and 11, 2012, Acme requested the motion be stricken (doc. nos. 50, 52). This issue was referred to Magistrate Judge Linda K. Caracappa (July 12, 2011 Order, doc. no. 49), who on July 15, 2011, granted the motion in part and denied it in part (Order, doc. no. 53).

On August 4, 2011, Bainbridge objected to the July 15, 2011 rulings, asserting that the sanctions imposed did not "go far enough" as to Acme's intentional conduct and that no explanation was given for denial of plaintiff's request for attorney's fees and costs, as well as other putative errors (doc. no. 54 at 1-2, 5, 9). On August 22, 2011, Acme responded that "sanctions were not even appropriate in the first place" because the personnel file was not intentionally destroyed and the "lost" documents occasioned no prejudice (doc. no. 55 at 3-5). A district court may reconsider, modify, or set aside a magistrate judge's ruling on a nondispositive pretrial matter, such as plaintiff's motion for sanctions here, if the ruling is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). Upon review, Bainbridge's and Acme's objections will be overruled.

2

## 2.  Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The evidence must be viewed in the light most favorable to the non-movant.  Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011).  In accordance with the July 15, 2011 rulings, Bainbridge is entitled to an inference that the contents of the personnel file were favorable to her.  See Order, doc. no. 53 at 2.  Adverse evidence regarding her "performance for the time period prior to June 2007" and any "performance-related issues not in connection with the disciplinary memos issued in 2007 or the loss prevention investigation" may not be offered or considered.  Id.

## 3.  Facts

Acme employed Valerie Bainbridge for 37 years from October 16, 1971 until July 18, 2008, when she resigned at age 62.  From December 17, 2006 through September 6, 2007, Acme had employed her as the office coordinator at its store in West Chester, Pennsylvania. The incidents at issue here happened after April 2007.  At that time, she was "probably the oldest person in the store."  Bainbridge dep., 109:8-10, Def. Exs. A-1 & A-2, doc. nos. 35-3 & 35-4; Pl. Exs. J-1 & J-2, doc. nos. 42-1 & 42-2.

In 2006-2007, Bainbridge was a full-time office coordinator for Acme – a non-management position subject to a collective bargaining agreement with the United Food and Commercial Workers Local Union 27.  She was paid on an hourly basis.  Among other

3

duties, she assisted the store director in the preparation of cash, sales, and other reports; handled cash, checks, and discount coupons; maintained records and files; and processed employee time clock punches and payroll.  The store director, Martha Thornley, and assistant store director, Kim Walsh were Bainbridge's day-to-day supervisors.[1]

Bainbridge had been given copies of Acme's work rules and company policies, which included: "violations of company rules will be cause for termination."  Def. Ex. J-1, doc. no. 35-11 at 4.  Acme's "Honesty and Accuracy" rule stated:

> Associates involved in any acts of dishonesty, including those described below, will subject themselves to termination, no matter what is later claimed to have been the intent. . . .
> 5.      Engaging in coupon fraud . . .

Id. at 5.  Customers at times left coupons issued at the self-checkout machines.  Acme did not permit employees to retrieve and use the coupons for their own purchases.  David Christmas dep., 98:21-99:21, Def. Ex. H, doc. no. 35-10.

Among Acme's written policies was the "time clock policy," which stated in part: "You must not work during times when you are clocked out," and "Your supervisor should never ask, imply or pressure you to work when you are clocked out.  If that does occur, promptly call the Company Hotline . . . ."  Def. Ex. J-1, doc. no 35-11 at 11-12.  Acme's

---

[1]  Acme employed various managers within the store (e.g., front end manager, deli manager, etc.) and employed other managers that oversaw operations in multiple stores (e.g., area service operations manager, associate relations manager, etc.).  In 2007, one such manager, Marianne Donaghue, was responsible for "making sure that office coordinators were doing their job right," and she reported to the division service operations manager, Marianne Nice.  Donaghue dep., 11:20-12:20, 30:8-11, Def. Ex. B, doc. no. 35-5.

policies identified "conduct that may warrant immediate discharge," such as: "Falsifying or making unauthorized adjustments to time clocks or time records, including recording time for another associate."  Id. at 18.  Bainbridge concedes having understood the time clock policy.[2]

In practice, Acme allowed employees to punch the time clock seven minutes before or after the quarter-hour in which they were scheduled to start and end their shifts.  The clock rounded the punch to the nearest quarter-hour.  Employees were permitted two 15-minute breaks and a 30-minute lunch.  If an error or omission was made in recording time, employees were required to sign timecard modification slips.  Bainbridge was responsible for maintaining the slips and correcting employees' time records to ensure that shifts were accurately recorded and that the clock's automatic rounding did not over- or under-estimate the actual length of a break or lunch period.

---

[2]  Bainbridge acknowledged receipt of Acme's time clock policy, which stated:

[A]ll hourly employees must use the time clock.  Failure to comply with Acme's time clock procedure will result in disciplinary action.

1.    Every hourly employee is required to record time worked on the time clock to Start Shift, Start Lunch, End Lunch, and End Shift. . . .
3.    An employee falsifying his or her time or knowingly recording time in or out for another employee, whether or not such recorded time is correct, will subject both employees to severe disciplinary action up to and including discharge for the first offense. . . .
5.    Free time:  Working when you are not punched in (referred to as *free time* or *off the clock*) will not be tolerated.  [Emphasis in original]
6.    Overtime must be authorized or scheduled in advance by the Store Supervisor or the Person-in-Charge.

Def. Ex. J-1, doc. no 35-11 at 37, 39.

On August 2, 2007, Thornley met with Bainbridge and her union representative, Carol Waite, for disciplinary counseling, see Def. Ex. J-1, doc. no. 35-11 at 41, and directed Bainbridge to submit the timecard modification slips for management's approval on a weekly basis. Bainbridge had been completing and keeping them in a binder at the service counter without showing them to Thornley. After employee paychecks were printed, she clipped them to the slips and asked employees to sign for them. When asked if she believed Thornley's instructions amounted to age discrimination, Bainbridge testified: "No. That was her right to ask me for those, and I probably should have been doing it, but I was never told to." Bainbridge dep., 52:15-19. Thornley also warned Bainbridge about unauthorized overtime. Bainbridge agreed she had worked 30 minutes overtime without Thornley's approval to manually enter records on a day the computer system had "crashed." Id., 57:13-58:10. When asked if she believed the warning about overtime was age discrimination, Bainbridge responded: "Like I said, I think this is a paper trail. She wanted to get rid of me and she was using this." Id., 60:5-11.

On August 21, 2007, Thornley and Bainbridge met again. According to Thornley, employees were not being paid correctly. See Aug. 21, 2007 disciplinary memo, Def. Ex. J-1, doc. no. 35-11 at 47. Bainbridge testified: "I was never told that" and "no one came to me and said they didn't get paid." Bainbridge dep., 66:19, 69:2-4. "The only time people didn't get paid right, in my opinion, is when Kim Walsh would make up the schedule." Id., 65:20-23. Bainbridge used the schedules to determine payments for sick, personal, and

vacation days.  She also used them to determine the hourly rate to be paid when an associate performed an absent manager's duties or when a manager performed an absent associate's duties.[3]  Instead of using the schedules, Thornley directed Bainbridge to cross-check payments against a computer payroll data base for time-off request forms.  However, Bainbridge found that the schedules and forms did not always correspond to what was happening in the store:  "So I just felt like, you know, they made a big deal about me following this work time-off request form . . . ."  Id., 69:12-70:7.

During April-September 2007, Thornley and area service operations manager, Marianne Donaghue, had a "recurring conversation" about "problems with payroll."  Donaghue dep., 165:20-166:25, Def. Ex. B, doc. no. 35-5.  They discussed Bainbridge's "inaccuracies of doing the timecard modifications and paying people properly."  Thornley dep., 173:25-175:8. Stacy Slate, associate relations manager:  "I did get calls from the union because they [associates] were calling the union because they weren't getting paid properly."  Slate dep., 114:16-23, Def. Ex. C, doc. no. 35-6.  Within a "few months," she received complaints from the union "several times.  Probably five to ten."  Id., 126:14-23, 117:3-8.

On September 6, 2007, Thornley, Donaghue, Waite, and Bainbridge met.  Bainbridge agreed to step down from the office coordinator position.  She was told to continue performing some duties of her position until another employee was hired through the union

---

[3]  For example, if a deli associate-employee was absent, and the deli manager performed the associate's duties, the manager would be paid at the manager's higher rate of compensation.  For periods of time in excess of three days, an associate who performed an absent manager's duties would be paid at the manager's higher rate of compensation.

bid process.  Some of Bainbridge's payroll duties were assigned to Kaitlin Roegner, who was 20 years-old and a three-year Acme employee, although when and how the duties were divided up is not clear.  Bainbridge dep., 87:2-18; Thornley dep., 213:16-22; Def. Ex. M, doc. no. 35-15 at 7.

But by the next morning, September 7, Bainbridge had changed her mind about stepping down.  She testified that after researching the payroll issues discussed the day before, she concluded the payments had been made correctly.  She communicated her desire to be reinstated to Slate, Walsh, Donaghue, and division service operations manager, Marianne Nice.  In an e-mail to Nice on September 27, 2007, Bainbridge stated:  "I did not want to step down . . . . I hope this is not an age issue."  Pl. Ex. I-1, doc. no. 42-11 at 8.  She told her union representative that she did not want to step down, but Waite "didn't, like, do anything about it."  Bainbridge dep., 85:9-15.  Waite later wrote to Slate:  "This is a follow-up letter . . . Valerie decided [at the September 6 meeting] to step down from her position as office coordinator."  Pl. Ex. I-1, Doc. no. 42-11 at 6.  Bainbridge was not reinstated.

Bainbridge testified several times that she did not tell anyone in Acme's management about the disparate treatment she believed she experienced.  On October 22, 2007, she called the EEOC and began the charge-filing process.  She says that she told several employees in the West Chester store that she had called the EEOC.  In 2007-2008, before she filed her charge, she submitted to the EEOC several questionnaires and other communications.

On November 4, 2007, Thornley and another union representative, Kim Carol, met

with Bainbridge to discuss omitted timecard modification slips and unauthorized overtime payments that she had made for five employees between October 10 and October 27, 2007. Three disciplinary memoranda were given her.  See Def. Ex. J-2, doc. no. 35-12 at 4-8.

In July 2007, Walsh asked Acme's loss prevention department to investigate Bainbridge.  On June 23, 2007, Walsh had called the front desk looking for Bainbridge, as well as once before on a previous occasion, but was unable to find her.  Walsh determined that Bainbridge had left before the end of her shift without punching out.  Acme's investigators reviewed video surveillance tapes that showed Bainbridge leaving before the end of her shift on June 13 (nine minutes), June 22 (12 minutes), and July 7 (12 minutes), 2007.  The video tapes were time-stamped two minutes earlier than the actual time. Bainbridge does not dispute the accuracy of the tapes.  Acme's time records state that Bainbridge did not punch out on those days, which Bainbridge also does not dispute. However, she asserts that she worked all scheduled minutes of her shifts because she either worked off the clock before punching in, punched in early, or took shorter or no breaks.

On November 23, 2007, Acme's investigators, David Christmas and Nicolas Miceli, met with Bainbridge.  In addition to the time and attendance issues, she conceded during the meeting that she had taken coupons:  "I told them that I had, maybe at some time, taken a coupon that was not specifically generated from me, because anybody can walk up and take coupons off the thing when they are purchasing their groceries . . . ."  Bainbridge dep., 132:22-133:3; Christmas dep., 98:24-99:3 ("she didn't see no harm in taking them if a

customer didn't want them."); Miceli dep., 131:5-132:4 ("she did admit that she was taking some of the coupons and the video showed that").  The investigators called Thornley into the meeting, and she suspended Bainbridge for two weeks from November 23 through December 6, 2007, without pay and pending termination.  The suspension was based on violations of Acme's time clock and coupons policies.

Bainbridge grieved the suspension through her union.  On November 30, 2007, she participated in a grievance meeting with Waite, Slate, Thornley, and Christmas.  Instead of terminating Bainbridge, Slate decided to allow her to return work at Acme's store in Westtown, Pennsylvania.  On December 7, 2007, she returned to work as a cashier-checker earning $.70 less an hour than her pay at the West Chester store.  In December 2006, Michelle Moore, then 26, was assigned through the union bidding process to the office coordinator position at the West Chester store.  Plaintiff does not dispute that Moore was selected because she was the most senior qualified applicant for the position.  Pl. Resp. Def. Stmt Facts ¶ 50, doc. no. 41.

Bainbridge maintains that she was humiliated and otherwise poorly treated by various employees at the Westtown store:  "I don't know that it was exactly age, but it was very unbearable."  Bainbridge dep., 179:14-22.  Bainbridge testified:  "The first day I was there, Carol Waite took me around and introduced me . . . it just drew attention to me that if the union is bringing me in, I must have dome something wrong, because normally when someone gets transferred, the union doesn't take people around. . . . So later different people

would come up to me and say, who did you [anger] and stuff like that. . . . But it just made me feel like everybody thought that I had done something wrong, and usually in Acme that means, you know, that you stole something." Id., 169:15-24, 170:9-12. "[T]he produce manager . . . would look at his watch when I took a break. He would look at his watch when I would come back. He would go into the salad bar area that I had cleaned and he would take corn that was supposed to be husked in the back room and he would go right where my spot was and he husked corn and all this stuff would fly on the tile and the husk would be on the floor and then he would tell me to clean it up." Id., 178:10-19. "Larry . . . the new manager . . . would not say good morning or good afternoon or anything else. As a matter of fact, my last day of work there he didn't even say good-bye, good luck, nothing. He didn't even talk to me that day." Id., 178:20-25. Bainbridge gave at least one month's notice before she resigned on July 18, 2008. From the time she arrived at the Westtown store until she retired, she had not discussed any objectionable treatment or filed a grievance with her union. She did not report any negative conduct to her managers, human resources, or the EEOC.

Bainbridge contends that the summary judgment record demonstrates younger employees were treated more leniently and were not disciplined for time-recording violations. She also contends that the record shows she was singled out for harsh treatment by Thornley and Walsh. Acme's evidence is that during August 2007-08, at least six employees between the ages of 19 and 30 were discharged based on violations of the time clock policy.

11

4.  ADEA and PHRA Claims

Both the ADEA and PHRA[4] prohibit employers from discriminating against "any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1); 43 P.S. § 955(a). Congress passed the ADEA "prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes."  Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993).  "The ADEA commands that 'employers are to evaluate [older] employees . . . on their merits and not their age.'"  Id. at 611 (quoting W. Air Lines, Inc. v. Criswell, 472 U.S. 400, 422 (1985)).  "The employer cannot rely on age as a proxy for an employee's remaining characteristics, such as productivity, but must instead focus on those factors directly."  Id.

A plaintiff may demonstrate that a legitimate factor has been used as a proxy for age "in the sense that the employer may suppose a correlation between the two factors and act accordingly."  Hazen Paper, 507 U.S. at 612-13.  "But to prove a violation of the ADEA, it does not suffice to show that age played some minor role in the decision."  Kelly v. Moser, Patterson and Sheridan, LLP, 348 Fed. App'x 746, 749 (3d Cir. 2009) (citing Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 129 S. Ct. 2343 (2009)), cert. denied, 130 S. Ct. 3386 (U.S. 2010).  "The plaintiff must show that age was the 'but for' cause of the adverse employment action – that age had 'a determinative influence on the outcome.'"  Id. (quoting Gross, 129 S. Ct. at 2350 (quoting Hazen Paper, 507 U.S. at 610)).  The burden of proof remains with

---

[4]  "The same legal standard applies to both the ADEA and the PHRA and therefore it is proper to address them collectively."  Kautz v. Met-Pro Corp., 412 F.3d 463, 466 n.1 (3d Cir. 2005).

plaintiff at all times.  Id. at 750 & n.8 (citing Gross, 129 S. Ct. at 2351-52).

Here, there are triable disputes of fact in light of the adverse actions taken against Bainbridge: (1) the five disciplinary memos; (2) her suspension and transfer to the Westtown store; and (3) her experiences at the Westtown store.  A reasonable jury could conclude that her age was "'the reason' that [Acme] decided to act."  Gross, 129 S.Ct. at 2350.

Bainbridge also proffers two statements as direct evidence of age discrimination. About September 7, 2007, Bainbridge approached Walsh and said:  "I didn't feel I should step down," and Walsh responded:  "Martha [Thornley] said to do it this way or we're going to write you up until you get fired."  Bainbridge dep., 114:3-9, 60:17-20.  On October 22, 2007, the day union candidates were interviewed for the office coordinator position, Thornley told Bainbridge:  "younger people were brought up on computers" and "older people have a harder time with them," and said, "even I do."  Bainbridge dep., 46:16-22, 62:7-16.  The record does not elaborate on these comments.

Such comments may not be direct evidence that Acme made an adverse employment decision because of Bainbridge's age.  "'Stray remarks . . . by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."  Fuentes v. Perski, 32 F.3d 759, 767 (3d Cir. 1994) (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992)). Here, both statements occurred outside any decisional process involving Bainbridge's employment status – after she had stepped down from her position and before Acme

13

suspended her. The suspension was not based on Bainbridge's ability to use a computer.

However, the comments have at least circumstantial weight in the context of Acme's disciplinary actions and whether it intended to remove Bainbridge from her position. Although Walsh did not mention age, her comment is evidence that Acme would not reinstate Bainbridge because of her age. Thornley's comment about younger computer-users was a commonplace observation that said nothing about Bainbridge's abilities, but a reasonable jury could conclude that Acme viewed her as an older person who was incapable of effectively using a computer: "I think she [Thornley] felt I wasn't computer literate, that she felt that the young kids have it in school all day long and they pick it up quick. . . . It's the only thing I can really figure." Bainbridge dep., 61:19-25.

The burden-shifting framework set forth in McDonnell Douglas v. Green, 411 U.S. 792 (1973) governs age discrimination claims. Deville v. Givaudan Fragrances Corp., 419 Fed. App'x 201, 205 (3d Cir. 2011) (citing Smith v. City of Allentown, 589 F.3d 684, 690-91 (3d Cir. 2009) (McDonnell Douglas applies to age discrimination claims after Gross)); Assoc'd Rubber, Inc. v. PHRC, 915 A.2d 689, 694, 696 (Pa. Commw. Ct. 2007) (citing Gen. Elec. Corp. v. Comm'r, Human Relations Comm'n, 365 A.2d 649, 655-56 (Pa. 1976) (adopting McDonnell Douglas)). Under McDonnell Douglas, a plaintiff must make a prima facie showing of age discrimination. Smith, 589 F.3d at 689. "The existence of a prima facie case of employment discrimination is a question of law that must be decided by the Court." Sarullo v. U.S Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003).

14

Here, no dispute exists that Bainbridge has satisfied plaintiff's prima facie burden to show:  (1) she "is forty years or older," (2) Acme "took an adverse employment action against [her]" in suspending and transferring her, (3) she "was qualified for the position" of office coordinator, and (4) she "was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus."  <u>Smith</u>, 589 F.3d at 689.  Moreover, Bainbridge has produced sufficient evidence to establish a genuine triable dispute  as to whether the adverse actions by Acme raise an inference of discriminatory animus.  On  the other hand, there is also no genuine dispute but that Acme has offered legitimate, non-discriminatory reasons for its actions:   the payroll errors, inadequate recording of employees' time, and taking of coupons.

Nevertheless, Bainbridge has  produced sufficient evidence from which a reasonable jury could decide that Acme's reasons were pretextual.  Bainbridge asserts that Thornley's comment about older people calls into question the credibility of all of Acme's disciplinary memos and actions.  The record shows that many younger employees committed the same type of time and attendance violations but were not disciplined.[5]

Acme's disciplinary counseling may be viewed as an adverse employment action.  "A

---

[5] Bainbridge's evidence of discrimination consists in part of her personal, subjective beliefs. <u>See, e.g.</u>, Bainbridge dep.,  220:7-10 ("I just felt there was age discrimination . . . .")  A jury will not be permitted to speculate based Bainbridge's personal perceptions and convictions that are not supported by objective evidence.  <u>See</u> <u>Hunter v. Rowan Univ.</u>, 299 Fed. App'x 190, 194 (3d Cir. 2008) (speculation and disappointment insufficient); <u>Noel v. United Aircraft Corp.</u>, 342 F.2d 232, 239 (3d Cir. 1964) ("mere speculation cannot be substituted for proof and the requirement is for probative facts capable of supporting with reason, the conclusion reached in the verdict").

tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). It is correct that Acme's disciplinary actions did not materially affect Bainbridge's pay or employment status. Her payroll duties were reassigned only after she relinquished her position. The only action by Acme that adversely affected her pay and employment status was her suspension and transfer to the Westtown store. However, a jury could reasonably credit Bainbridge's evidence of being singled out for discipline in order to force her to leave Acme because of her age.

Bainbridge maintains that the severity of the harsh treatment she received belies Acme's discriminatory motive. The record demonstrates that Bainbridge was the only employee to have been investigated in order to document her violations of company policies, which were frequently violated by other employees as well. However, the record also shows that some younger employees who violated the time clock policy were discharged or forced to resign in lieu of discharge. "To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken." Fuentes, 32 F.3d at 764.

Acme appears to have acted in accordance with its policies and procedures, which Bainbridge concedes she understood. Acme conducted an investigation and gave her an opportunity to respond to its findings. Bainbridge admitted that the investigators'

16

conclusions were correct.  Under its policies, Acme was not required to allow her to return to work.  Nonetheless, Bainbridge has produced sufficient evidence that Acme's selective application of its policies and procedures may be equated with discriminatory animus.

Bainbridge also submits that she was forced to resign because of poor treatment at the Westtown store.  She did not make Acme aware of any of the problems she claims to have experienced there.  Acme did not ask her to retire.  However, a jury could accept Bainbridge's evidence that she was transferred to Westtown and intentionally subjected to humiliation there in order to force her to leave Acme – because of her age.

Both the ADEA and PHRA prohibit retaliation against an employee who "has opposed" age discrimination.  29 U.S.C. § 623(d) ("made a charge . . . or participated in any manner in an investigation . . . under this chapter"); 43 P.S. § 955(d).  An employee's reports or complaints that do not identify any proscribed conduct cannot form the basis for a retaliation claim.  Davis v. City of Newark, 417 Fed. App'x 201, 203 (3d Cir. 2011).  There is nothing showing that Acme was aware Bainbridge had contacted the EEOC until October 2008, when Acme received notice of the charge of discrimination.  On November 4, 2007, within two weeks of her first call to the EEOC, she received three disciplinary memos.  There is a triable issue whether Acme retaliated against Bainbridge for her participation in the EEOC charge-filing process.

## 5.  FLSA Claims

The complaint also claims "off-the-clock" overtime "[o]n almost every workday."  Pl. br., doc. no. 36 at 3; Compl. ¶¶ 115-122.  The FLSA prohibits the employment of any person

"for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of [40] hours . . . at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  The Portal-to-Portal Act of the 1947, 29 U.S.C. §§ 251-262, amended certain sections of the FLSA.  Section 4(a)(2) of the Portal-to-Portal Act "'excludes activities which are preliminary to or postliminary to [a] principal activity or activities' from the scope of the FLSA."  IBP, Inc. v. Alvarez, 546 U.S. 21, 40 (2005) (quoting 29 U.S.C. § 254(a)(2)).  Time that hourly employees must spend waiting to punch into a computerized time clock is generally a "preliminary" activity, not "'integral and indispensable' to a 'principal activity' that identifies the time when the continuous workday begins."  Id. at 42; 29 C.F.R. § 790.7(g) (2012) (preliminary activities include "checking in and out and waiting in line to do so").

According to Bainbridge, the former office coordinator, Mary Kulokoski, gave her a key to the store and told her to arrive early about twice a week:  "So I was pretty much always on time.  Usually sitting in the parking lot a half hour early because I didn't want to be late . . . [w]aiting for someone to come that wanted to be let in. . . . Someone had to open the door because there was no night crew."  Bainbridge dep., 136:2-137:9.  "I also helped bring the bread racks into the store at the time I unlocked the door for arriving employees."  Bainbridge Decl. ¶ 8, Pl. reply br., Ex. 3, doc. no. 47-1.  Bainbridge asserts that since her key had to be specially ordered by a former store director, Acme's "management . . . had to know" she was arriving early to open the door for other employees:  "Why would they give

18

me a key if I wasn't supposed to use it?"  Bainbridge dep., 138:4-140:24, 219:13-17.  She

did not complete any timecard modification slips for the time she worked off the clock, and

she did not inform her immediate supervisors or other managers about the unrecorded work.

Bainbridge's possession of the key is some evidence that Acme's management

expected her to arrive early and work off the clock.  It presents a triable dispute that the time

she spent waiting to clock in for her scheduled shift is compensable.

Rulings on defendant's statute of limitations defenses under the PHRA and FLSA are

reserved for trial.

An order accompanies this memorandum.


BY THE COURT:


/s/ Edmund V. Ludwig
Edmund V. Ludwig, J.